May it please the Court. Good morning, Your Honors. My name is Jennifer Lerner, and I represent Petitioner Mohamed Emu Ademo. Mr. Ademo first arrived in the United States in December 2002 after fleeing persecution in his native Ethiopia, where he was persecuted based on his Oromo ethnicity and political beliefs. He is now a journalist working in the University of Minnesota, and then completing a dual degree program at Columbia University's School of International and Public Affairs and their Graduate School of Journalism. Now, the persecution of the Oromo ethnic group by the ruling Ethiopian government is well-documented, and it's detailed in the numerous submissions. And I won't go through that here, unless the panel has any questions. Mr. Ademo himself was an Oromo student activist in Ethiopia, and he has told the same consistent story regarding the persecution of his family, him personally facing interrogation and beatings by the Ethiopian security forces, being arrested multiple times, the conditions of his imprisonment, and the circumstances that forced him to flee the country in 2002. And again, I won't go into this history in detail. It's been covered in the papers, but I will note that during his imprisonment in 2001, Mr. Ademo was repeatedly beaten with a rubber hose. And at the first meritorium in this case back in November 2005, before the immigration court, Judge Dirks, who was the IJ at the time, observed for the record that Mr. Ademo had half a dozen or more linear scars on his lower back, one that could be 10 inches long, another four or five or six inches long. And I mentioned this in particular, because although immigration Judge Castro, who eventually decided the case that is being appealed, found in her March 2011 opinion that Mr. Ademo had provided insufficient corroborating evidence of his detention, she did not even mention his physical injuries and scars. As this court has observed in Belido and for petitioners who have been in prison to find corroborating evidence of their detention. They don't generally hand prisoners their records on when they are fortunate enough to be released. And corroboration exists for Mr. Ademo's testimony and the scarring on his back, just as there was corroboration from his Zaudis scarring on her feet, and nothing more is needed. In this case, the IJ appears not to even have considered this corroborating evidence, which is clear error. So let me go back a little bit, since it's now 2014 and Mr. Ademo first arrived in this country in 2002. So what happened here? Mr. Ademo entered the country using a passport and visa with a false name, Dame Haji Hiko. And again, in his asylum application, in the subsequent testimony, he's told the same story regarding obtaining a false ID with the help of a family friend, police officer, and using that ID to obtain a passport and visa. He testified that Dame was a nickname that his family often called him, and he made up the names Haji and Hiko. In June 2006, Immigration Judge Dirks granted Mr. Ademo's asylum application, making a finding that Mr. Ademo was legally credible, and noting that it's not uncommon for individuals who are fleeing the country to use false documents. He apparently found it strange that Mr. Ademo was allowed to take his school-leaving exam during the time he was imprisoned for six months in 2001, but determined that this one part of Mr. Ademo's story did not undermine the entirety of his claim. You know, the 2006 hearing simply isn't its background, but it's not relevant to these appeals. Well, it's relevant because there's still... You've got to deal with the adverse IJ opinion, not the friendly one. Right, so I'll get to that, and I'll move quickly there. The motion to reopen filed by the DHS was based on the visa application form submitted by Mr. Ademo, and in particular, the non-immigrant visa referral form that was submitted. That essentially provided the basis for Judge Dirks to reverse his opinion, deny asylum, and Immigration Judge Castro subsequently relied on his opinion in finding that this document... Okay, I'll move on. I'll move on. Let's look at the immigration, the two bases for the adverse finding. If the visa form that references Dame Haji Hiko and says that he is the brother of Ato Tahir Haji, head of VIP security of CIRA, which is apparently the Ethiopian security force, Mr. Ademo testified that he is not related to and never heard of Ato Tahir Haji. He was not interviewed about him. Nonetheless, on the basis of this document, for which there's been no authentication, even though Judge Dirks previously asked the government to find out more, there was reference to an embassy investigation, no one has been able to explain where this document came from. Mr. Ademo was asked about it and was faulted for not having an explanation, but this is not a form he signed or ever saw before. He has always testified that he obtained his documentation under false pretenses, so to take his testimony that has been consistent and on the basis of this one document, determine that he's no longer reliable, I'd submit as clear error. Okay. So here, what we have is the immigration judge relying on impermissible speculation to come up with their holding and make this adverse credibility determination. What's your impermissible speculation authority? I mean, in case law. So let's take a case that was decided by this court last year. It was decided in December 2014, so it's not in the brief, but a Zhang v. Holder, very different set of facts, this involved a Chinese immigrant who had been forced to have an abortion in China. And the court there found, speculated that they didn't think that she would have asked for a photograph or evidence of this abortion. Now here, similarly, again, very different facts, but the IJ impermissibly speculated that Mr. Ademo could not be relied upon because he had been let out of prison where he'd been beaten to take this exam, to take the Ethiopian school exam. The only evidence in the record on this subject is Mr. Ademo's consistent testimony and the expert affidavit of Mr. Segne, who outlines his qualifications in his affidavit. He was a former Ethiopian official, a former Ethiopian judge and an advisor to the consulate. And in his affidavit, he states that as a matter of general practice, Ethiopian prisoners are allowed to take their school-leaving exam. The judge did not provide any basis for discrediting this affidavit, but instead, without citation to the record, without taking notice of facts outside the record, simply said she found it implausible. I'd submit there's no basis for that when the evidence in the record is clear. There's no basis to discredit an affidavit from this Ethiopian consular official. Well, the board said that the official didn't speak to political prisoners, and your client claims to have been a political prisoner, and the board thought it's facially implausible that if the reason for holding him is political retribution, that the government would facilitate his advancement. And Mr. Segne apparently didn't speak to that particular scenario. It's correct that he did not specifically cite political prisoners, but the judge doesn't make clear why that would be relevant. Well, I thought the argument was that it's more implausible that if the reason for holding the man is political retribution, that they would want to facilitate the advancement of his career and education, and that makes it different than if he's held for theft or something like that. Well, I think the board makes that point. I respectfully submit that they don't make that point clear, that that would be a reason. Perhaps, again, I think that's speculation. The judge does not take into account Mr. Adimo's testimony that he had to beg the officers to let him take the exam, or that the officers used the exam as a form of coercion, telling him, the truth, and you'll take the exam. And just I'll note, if you're going to go outside the record and speculate, I'll submit to the court that it's very easy to do an internet search on this. I would think Mr. Segne's affidavit is sufficient, but you can search for Dr. Gebre Gamer Mariam, who's a respected economics professor at Virginia Tech, who was taken as a prisoner of war by the Ethiopian army, and apparently holds a record for the highest school leaving exam. Very brief. Before you use up all your time, I did want to ask you this question, and I was looking for my notes, so if you touched on this and I wasn't listening, I apologize. But is there a claim here in 3566 that the BIA did not address the Convention Against Torture claim as it relates to the petitioner's recent activities as a journalist? Yes. Would you speak to that? Yes, absolutely. I think even if you did not find his identity and reliability were not upheld, it's undisputed that since arriving in the United States, Mr. Adimo has been an outspoken Oromo activist and is known to Ethiopian authorities. So the court has to at least consider whether he faces the possibility and probability of torture if he were returned. The court erred by not even considering that issue. There's additional evidence submitted on the motion to remand, which as you know, is subject to a separate appeal. But there's additional evidence of his journalistic activities there, as well as evidence of his identity that the court's previously deemed material. I think Judge Shepard was referring to the second appeal. Yeah, yeah. And so I wanted to address that as well as the evidence of identity that's there that is sufficient to warrant reopening the case. Very briefly, with regard to the factual record does not support that Mr. Adimo provided any material financial assistance to the OLF, I want to also note for the court and will submit a 28J letter that recently the DHS issued an exemption for the OLF, primarily because of this conflation of OLF with the Oromo community and support for the Oromo community, which is what the IJ and BIA did here. And with that, unless there are further questions now, I'll reserve the rest of my time. One thing I wanted to ask you about, and that's how much in the record there is about this Amharic Gregorian calendar issue, which seems pretty significant on the first appeal in the sense that the government summarizes the basis for the adverse credibility finding based on college years. And the reply brief seems to say, well, you know, just go on the internet and find out how to convert. What is there in the administrative record on the calendars used in all these different documents? So there's not a ton in the record because this issue did not come up. I think the court and the parties recognized the application of this calendar. But to look in the record, you could, one, look at the school leaving certificate, which shows both dates. It shows that Mr. Adimo graduated in 2001. And then in parentheses, it notes the 1993 EC calendar year. And in Judge Dirk's discussion of this document, he also notes when he discusses the school years that Mr. Adimo attended, he makes reference to both of these dates, clearly recognizing that there is this difference. Thank you. Okay. Good morning. Alison Igo, representing the Attorney General. This case is about an individual with two proved genuine passports, one of which had a proved genuine U.S. visa. One of those passports was... Let me start right. Yes. Do you agree that the school learning certificate, if you understand how to read it, shows the dates in both calendars and confirms that the schooling was in Gregorian 2001? I don't agree. First, I'd like to say is that there's not a ton, is rather an overstatement of what's in the record. There is nothing in the record. There's nothing that says on the school records that indicates what it's in. The entire record is in English, which suggests when you look through the record, many of the records from Ethiopia that are written in English... Both dates are on that certificate. Is that true? On the school leaving certificate, very interestingly, the record is in... The most prominent is in the Gregorian calendar. It shows 2001. And then I believe in parentheses, it says EC. I'm not sure what that is. Is this documentary evidence contrary to the government's argument that... No, not at all. No, I think it actually supports our argument because... I thought the government's theory was schooling, excuse me, all took place in the 90s. No. Not when he was being beaten. The school leaving certificate, that one document, all of the other records show him being in school in 1994. And what the petitioner's argument is, oh, well, it shows him being in school in 1994 and leaving in 1994. But that's only because that's in the Amharic calendar, and you have to convert that. But the school leaving certificate is in the Gregorian calendar first. And that's it. I mean, that's their argument now. And what the IJ says is, it's not clear what the IJ knew. The IJ doesn't say, oh, yes, yes, that's the Amharic calendar. He says, it appears that that's what it is. But I'm not really sure what these dates are because there's so much variance. I don't know what the dates are. That's what the IJ said. That's on AR-169. He says, I'm not sure exactly because of the variance in the April 2008. So the IJ doesn't find that this is Amharic calendar and these are the dates. He says, I'm not really sure. There's just so much variance. So and there's no Amharic calendar in there. And frankly, it could be the petitioner points you to the internet. But when you go on the internet, there's also a very separate AROMO calendar. The AROMO community has their own calendar. So when it comes up in terms of the motion to reopen, where his AROMO relatives give affidavits that are supposedly dated according to the Amharic calendar, my question is, well, they're AROMOs. Why aren't these dated according to an AROMO calendar? If we are, I mean, to me, I looked at the date and they're in English. And why isn't it Gregorian? But if we're starting to guess or estimate, it could be AROMO, could be Amharic, it could be Gregorian. But there's nothing in the record that says really what these dates are. And let's just stick to the, if the learning certificate is 2001 Gregorian, why isn't, doesn't that support the testimony with respect to the beating and the detention and the leaving and being allowed to take the exam? Because the judge also expressed some concern about the picture. Well, I understand that. And he explains that I mailed it back when my school buddies wanted me to be in there. No, no, no. That's a different picture. That picture is, that picture is on the yearbook. But the, but the judge expressed concern about the picture that was supposed to be attached to that learning certificate. He says that there's a space for a digital, a digital picture and it looks like the, or rather that there should be a picture there, but there's a digital image. And so the, so the judge wasn't, wasn't convinced about, about that, about that certificate at all. And so it's not clear that any of the, any of these school, school records that the judge accepted these as they were presented. So what we have is, what we have is an individual who came into court with two genuine passports in two separate names. And what the petitioner does not address at all in his briefs and comes here and addresses and dismisses is a genuine passport in the name and a genuine US visa. He was recommended for that visa by a US official who is in charge of security in that company, in that, I'm sorry, in that embassy, in that country, on the basis of his relationship and knowledge of the help that the head of that, of that security agency in Ethiopia gave to the US embassy. And that official, the regional security officer in the US embassy, recommended this petitioner for the, for a visa on the basis of his relationship to the head of this Ethiopian security agency. And this petitioner cannot explain how that happened and it's just dismissed. Now my colleague stood up and said, oh, we don't know where that, where that document came from. That document was handed to the immigration office by the state department that came through the state department. That was a visa referral form that went through the US embassy at the time this petitioner applied for his visa. And it recommends him specifically. He came into the embassy as Dame Haji Hiko. Hiko, I am assuming according to his testimony, was the, was the father's name. So he would be, according to his testimony, he would be Dame Haji. The head of the agency would have been Atto, which would be Mr. Tahir Haji. And he says that he just picked this name out of the air, but he happened to have picked the name of the head of the security agency, which also happened to be the agency that issues the pass, the Ethiopian passports in that country. Now I just, I want to quickly address because what, what the petitioner is asking this court to do is reweigh all of this evidence. And that's not this court's job. What this court, what this petitioner has to do is come before this court and show that the evidence in this record would compel any reasonable fact finder to reach a different conclusion than the conclusion reached by this agency. And when you have two completely genuine passports in two with a genuine U.S. passport on the recommendation of the regional security officer in a U.S. embassy and the second of which was issued in a name where the petitioner claimed. Does the record show where the regional security officer, what position he or she held at the time of the second hearing? No, it doesn't. There was no declaration or affidavit from that. The regional security officers hold two-year positions in the embassies. Most of the embassy, I know this because I served in an embassy, they, they, they hold the, they hold two-year positions and then they, and then they move. There wasn't any supporting affidavit or declaration regarding the referral form, right? Like why can't, why shouldn't we have? I don't know why they couldn't find the individual, but the petitioner testified that he was interviewed by a white male when he went to the, when he went to the embassy. So he clearly was interviewed by somebody when he went to the embassy to get his visa. I don't know whether it was the security officer that he spoke to, but he clearly was interviewed by someone. Could you address this convention against torture issue? I will. May I, may I just, I just would like to, to, to address this, this second passport. All right. He was able to, throughout, throughout his testimony, he says he had absolutely no ID in this name, Mohamed, Mohamed Adimo. And yet he was able to go to the Ethiopian embassy, I assume, which issues the passports in, in perhaps here or consular here. And from a country that he claims he cannot go back to because he will be tortured. He couldn't leave that country in that name. He was able to go to a consulate or an embassy here, and that country gave him, without any government issued ID, they gave him a passport in that name. And these are the two genuine IDs. And so the, the, this court cannot reverse the agency of the adverse credibility unless the evidence would have compelled any rational fact finder to reach a different conclusion. And I say just that fact alone would not compel any rational fact finder to reach a different conclusion. As far as the torture convention. I'm referring to Judge Shepard's question earlier in the procedural argument that the petitioner makes that the board and the IJ didn't address independently his convention claim because it was allegedly based on factors other than his withholding and asylum. No, the original torture convention claim was based on exactly the same facts. And this court's precedent and precedent in every other circuit says that when a claim... You say it was only on the reopening when he raised the journalism? It was only on the reopening. And the, what the board said was that, you know, the petitioner didn't at all address, there were these affidavits that went to his identity that they were, they should have been available at the time. They found that they wouldn't have changed the adverse credibility, that he was not, that he didn't at all address the material support issue and that all of this evidence... No, I'm talking about the convention argument though. When did he put in the evidence that he was engaged in the journalism activity in the United States and that this supported an argument about torture? All of that evidence was put in on the motion to reopen. And all of that evidence is a change in personal circumstances, which wouldn't support. And as far as what petitioner is arguing is that it wouldn't support a torture convention claim because what the petitioner just argued was that there is a possibility. What he has to show is that, pardon me, I just wrote down the standard. Yeah, you're just saying it was insufficient. It's more likely than not that... Did the board address this argument? The board didn't address the argument. It just kind of summarily said... It just summarily said that... It's not enough to change... It said it's not enough to... That on a motion to reopen, that the evidence has to be that there would be a reasonable likelihood of it changing the decision and that... So as a matter of administrative law, can we affirm that even though they didn't address in any detail the... Well, the standard is an abuse of discretion. Sufficiency of the torture evidence? You would have to find that the board abused its discretion, that the evidence was such... It's failing to consider. But I think that in reading and I think that in... What is the convention required of the US government on this situation? Someone who was removed... Everything that's gone before has been soundly decided, but now by reason of the person, the alien's been in this country, he or she has done actions that are likely to prompt persecution if returned. But it's not just likely. It has to be more likely than not that he would be subjected to torture. That's an evidence of the showing. I'm talking about why doesn't the BIA under Convention Against Torture International Law have to at least worry about that? Why can't... We've remanded plenty of cases because there simply was a failure to take up a relevant issue. Why isn't this one of those? I don't think that this is the case. I mean, the problem is that there's a whole lack of identity. There's a whole lack of credibility in this case. And the fact is that... But there is no... There's very little evidence that they know he's... His evidence in the record was that his statement was that one time he walked into an embassy and they didn't allow him to come in. And a second... And that he has been hired by Al Jazeera and that he has... All I asked you was whether it's relevant under the Convention Against Torture. If the showing is... We can look at the showing, but if the BIA just dismissed it out of hand based on the lack of credibility in earlier proceedings, that would suggest some... But you can't say that they did that. If you look... Because you can look at the showing. And the showing is so below the standard... You're just saying that it was so insubstantial that they had no obligation to address it at any length. Is that your position? Yes. Because the cases say that the board doesn't have to address in a long exegesis every single claim. It was an insubstantial Convention Against Torture claim raised on reopening and therefore some summary rejection was okay as a matter of... Was okay as a matter of administrative law. They did not abuse their discretion by not addressing it in a lengthy paragraph because it was insubstantial and would not have met the standard and my time has run out. There's a record about addressing whether the Ethiopian government today is likely to persecute an alien who has returned to the country having stirred up political opposition abroad. I don't believe so. I mean, it's plausible. There are a lot of places in the world, unfortunately, where that would happen. It's plausible, but the standard is much greater than that and the standard is also torture. It's not persecution. It's torture and it's more likely than not. It's not a plausibility. Maybe this is incorrect, but I thought there were some new country reports that had been placed in the record with respect to this point about the additional risk that's created by these journalism activities. Am I incorrect on that? There are, but I believe that those are journalists who are presently in the country and I also am not sure that it is that all of them rise to the level of torture. Torture is a very, very high bar. It is not the bar that, as this court knows because it has addressed it in many opinions, torture is not the same bars as persecution. That's what I'm getting at. The new information is affidavits about his activities as a journalist, new country reports. Is that part of the new information? It's affidavits about him having run into an individual in an embassy, about his blog being and what I'm saying is that the bar for convention against torture protection is very, very high. It is not like asylum where it is persecution. You have to, it has to be more likely than not and it has to be torture, not persecution. So did the board say that about this, about this point? They didn't say it about this point, but I'm saying is that they didn't, is that they, I don't think that they had to necessarily. Thank you. Thank you. Thank you. To briefly respond on this convention against torture point. Yes, the BIA does have an obligation to address that claim. Um, they, um, the government is correct that the standard is more likely than not and it's torture, not persecution, but the court has to address it. And yes, there was new evidence submitted regarding Mr. Adimo's journalistic efforts as well as reports of persecution of journalists in Ethiopia. Was there any evidence of torture of journalists in Ethiopia? Um, that does depend on how you define torture, but yes, they detail imprisonment without being let out, without having charges. There's reports of journalists being held. What case says that's torture? To be held in prison. Indefinitely. Um, I, I, sorry, I don't have a citation for you on that right now, but I think you need to at least look at that evidence. The BIA did not do that. What do you say to the government's point though, that if, if it's an insubstantial argument, they're not required to spell out why they're rejecting a motion to reopen on that basis. If you didn't have any evidence of even journalists in Ethiopia being tortured, why do they have to write? If it's their view that the evidence is insufficient to show that, I do think they have an obligation to address the claim. The convention against torture claim is whether there would be torture if he was forced to get sent back to the country. Um, and I don't think you can summarily dismiss that without any reasoning, without explaining that this is what you've done. What they did is just rely on the asylum determination and say that that was not enough, but these are different. Um, these are based on different circumstances. I know my time is up, um, very quickly, just to correct something. Um, the government said with regard to Mr. Demo's government ID, when he got his new passport, that was on the basis of his school leaving certificate that's issued by the department, the ministry of education, um, which is the government in Ethiopia. On this convention against torture claim, do you agree that we're just talking about the motion to reopen on that issue? I, I, I disagree with that because I think what was submitted, you go back to the very first, there's obviously a number of opinions. What you have in the, in the decision, um, before the motion to reopen is a failure to consider Mr. Demo's activism. He, he had not graduated from school yet, but he was known in the Aromo community as an Aromo activist. So I don't think that was addressed at all. It was only, it was the, the IJ relied on, um, the identity and credibility as to what happened in Ethiopia, but did not consider that what, the possibility that based on his activism in the United States, he could face torture. And it could be more likely than not that he would if he was forced to return to Ethiopia. So I do think, I think the evidence is stronger on the motion to reopen through the time that's passed and his continued activism and journalism. But I do think there was a failure there to even address it. Thank you. Thank you, counsel. A case with a long history and many issues. It's been well briefed and argued and we'll take both appeals under advisement.